Filed 12/8/22  In re Danielle E. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DANIELLE E., a Person Coming Under the Juvenile Court Law. | B320121 (Los Angeles County Super. Ct. No. 20CCJP01090B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LESLIE F., Defendant and Appellant. | |

APPEAL from the order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Gary E. Beeks for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Leslie F. (mother) appeals the juvenile court order terminating her parental rights over her two-year-old daughter, Danielle E.  Mother argues that the court erred in declining to apply the beneficial parent-child relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  We conclude the court did not err, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Mother has two children—Madison (born June 2011) and Danielle (born February 2020).  The two children have different fathers.

Mother has been using methamphetamine for more than 16 years, on and off.  Although mother denied using the drug while she was pregnant with Danielle, she tested positive for the drug three times between March and December 2019 while pregnant.  Two of those times the test showed "very high" levels of

---

1    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

methamphetamine.  Fortunately, Danielle was born without any methamphetamine in her bloodstream.

## II.    Procedural History

### A.    *Jurisdictional and dispositional findings*

A few days after Danielle was born in February 2020, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to assert dependency jurisdiction over Danielle to due mother's history of substance abuse and "current abuse[] of methamphetamine[]" as well as Danielle's father's failure to take action to protect Danielle, both of which posed a danger to Danielle's physical health, rendering jurisdiction appropriate under subdivision (b)(1) of section 300.[2]

Danielle was detained from mother five days after she was born.  She was initially placed with an unrelated foster parent.

In the next few months, mother tested positive for methamphetamine and also skipped two drug tests.  She checked herself into a residential drug treatment program, and the very next day checked herself back out.

On June 8, 2020, the juvenile court sustained the petition and removed Danielle from mother's custody.  The court also ordered the Department to provide mother with reunification services, and the Department subsequently developed a case plan of services for mother to complete—namely, a six-month drug

---

[2]    The Department also asked the court to exert dependency jurisdiction over Madison.  The court did so, and then terminated jurisdiction and placed her with her father.  Madison is thus not part of this appeal.

Father is not part of this appeal, either.

program, individual counseling, and parenting classes. Mother was also given the right to monitored visits with Danielle.

### B. *Reunification period*

Mother received reunification services for 18 months—from February 2020 until the juvenile court terminated those services on August 31, 2021.

On April 17, 2021, Danielle started living with a maternal uncle and his wife (the caregivers).

For the first 12 months of the reunification period, mother did not enroll in any drug program, did not participate in counseling or classes, and missed several drug tests. Her monitored visits with Danielle were sporadic, and a report prepared on January 15, 2021, noted that Danielle had only one visit with mother in the prior six months.

In the last six months of the reunification period, mother enrolled in—and completed—two different in-patient drug programs (one that was 60 days and a second that was 90 days), but did not complete the back-half out-patient portion of either program, which was necessary to satisfy the six-month program requirement in her case plan. Mother also tested positive for methamphetamine while she was in between the two in-patient programs. During this period of time, mother continued with her monitored visits, although she was often late, often left early, and often brought other people with her or encouraged Danielle to play with other kids (thereby leaving mother less one-on-one time with Danielle). During those visits, Danielle expressed a strong preference for her caregivers over mother: When mother tried to hug Danielle, Danielle would turn away; when Danielle would trip or get hurt, Danielle sought solace from the caregivers, not mother; Danielle would hover near the caregivers, such that

4

mother had to move Danielle to a place away from the caregivers for Danielle to focus on mother. In one March 2022 visit, Danielle clung to the caregiver as the caregiver tried to pass Danielle to mother; Danielle cried out "mama" and held out her hands for the caregiver. After each of those visits, Danielle was invariably happy to be reunited with her caregivers. Mother did not call or otherwise attempt to communicate with Danielle between monitored visits.

During the time Danielle lived with the caregivers, she had developed a "healthy attachment" to them and they, in turn, had "strong[ly] bond[ed]" with her. She called them "mom" and "dad."

On August 31, 2021, the juvenile court held the 18-month status review hearing and, based on mother's partial compliance with her case plan, and the fact mother never progressed beyond monitored visitation with Danielle, terminated the reunification services.

### C. *Termination of parental rights*

On April 26, 2022, the juvenile court held the permanency planning hearing.[3] Mother testified that when she arrived for her visits with Danielle, Danielle would run towards her with a smile, and would call her "mom." Mom also testified that she tried to contact Danielle between visits, but that the caregivers would not allow her to talk to Danielle.

Mother asked the juvenile court not to terminate her parental rights over Danielle because, in mother's view, she qualified for the beneficial parent-child relationship exception to adoption. Danielle (through her counsel) and the Department

---

[3]     Prior to that hearing, mother filed a motion to reinstate reunification services, but the juvenile court summarily denied the motion. Mother does not appeal that ruling.

opposed application of the exception. The juvenile court found the exception inapplicable, reasoning that although "mother has maintained regular and consistent visitation and contact [with Danielle], and that has conferred a parental . . . relationship," "the court cannot find by a preponderance of the evidence that . . . to the extent that [the] parent/child relationship has been created, that it outweighs the benefits of permanence in adoption, nor that it would be detrimental to the child to sever the parent/child relationship."

The court then terminated mother's parental rights over Danielle.

### D. *Appeal*

Mother filed this timely appeal.

## DISCUSSION

Mother argues that the trial court erred in declining to apply the beneficial parent-child relationship exception and, on that basis, in terminating her parental rights over Danielle.

Once a juvenile court has terminated reunification services or a parent is deemed ineligible for them at the outset, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence,'" "'that it is likely the [child] will be adopted'" within a reasonable time. (§ 366.26, subds. (a) & (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subd. (c)(1) & (1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7).

One of the six exceptions is the beneficial parent-child relationship exception.  Because this exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, 635 (*Caden C.*), italics omitted.)

In assessing whether the parent has engaged in regular visitation and contact, a court looks to how the parent's actual visits measure up against the extent of visitation permitted by the juvenile court's orders (*id.* at pp. 632, 636); to satisfy this element, contact must be consistent; "sporadic" visits, or visitation with "significant lapses," are not enough.  (*In re A.G.* (2020) 58 Cal.App.5th 973, 994-995; *In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  In assessing whether the child would benefit from a continued relationship with the parent, the parent must show "that the child has a substantial, positive, emotional attachment to the parent" in light of several factors, such as the "'[(1)] [t]he age of the child, [(2)] the portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of the interaction between parent and child, and [(4)] the child's particular needs.'"  (*Caden C.*, at pp. 632, 636, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home," a court is to examine "how the child

7

would be affected by losing the parental relationship" entirely. (*Caden C.*, at pp. 633, 636-637.)  This is necessarily a "subtle, case-specific inquiry."  (*Id.* at p. 633.)

We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.)  Because the parent bears the burden of proving visitation and a relationship to the juvenile court, a parent can succeed under the substantial evidence standard applicable to the first two elements on appeal only if the evidence in the record compels a finding in the parent's favor as a matter of law; this is a notoriously difficult showing to make.  (*In re Luis H.* (2017) 14 Cal.App.5th 1223, 1227; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 967.)

Because the juvenile court found that mother had regular visitation and contact with Danielle, this appeal deals with whether the juvenile court erred in finding that mother did not satisfy the remaining two elements.  As explained next, there was no error.

Substantial evidence supports the juvenile court's finding that Danielle did not have "a substantial, positive, emotional attachment" to mother, such that the two lacked a substantial beneficial relationship.  Danielle is now just over two years old, and spent only the first five days of her life in mother's custody. More to the point, Danielle's reaction to mother during their monitored visits indicates that Danielle has not had a "substantial" or "positive" "emotional attachment" to mother: Danielle tried to avoid mother's hugs; Danielle went to her

8

caregivers rather than mother when she needed solace; Danielle would play with mother only when the caregivers were nearby; and as recently as March of 2022, Danielle cried and clung to her caregiver rather than be passed to mother. Mother responds that Danielle's limited attachment is a product of Danielle's removal from mother's custody at birth and the limited amount of visitation mother was accorded by the juvenile court; in effect, mother argues, mother has done the best she could with the opportunity to develop an attachment that she had. We disagree. The law gives mother a maximum of 12 months of reunification services for children, like Danielle, under the age of three (§ 361.5, subd. (a)(1)(B)), but the juvenile court here gave mother 18 months of such services. What is more, when we construe the record in the light most favorable to the juvenile court's findings (as we must), the record does not support mother's assertion that the absence of a substantial attachment was everyone's fault but mother's: Mother did not begin to work on any of her case plan until 12 months into the reunification period; mother did not contact Danielle between visits; and mother did not use all of the visitation time she was accorded (because she was often late, often left early, and often brought other adults or children with her that took away from her one-on-one time with Danielle). Had mother made better efforts with her case plan and with her visits, there is no reason to believe the Department and juvenile court would not have recognized those efforts by allowing for unmonitored visits with mother that would have given Danielle even greater opportunities to bond with mother. At bottom, the record does not compel a finding that Danielle had a substantial, positive emotional attachment to mother. The absence of this

9

element, by itself, is fatal to the applicability of the beneficial parent-child relationship exception.

The trial court also did not abuse its discretion in concluding that the harm Danielle would suffer from terminating her relationship with mother was outweighed by the stability and permanency that would come from adoption by her caregivers, the maternal uncle and aunt. On the one hand, Danielle would not likely suffer much detriment if her relationship with mother was terminated given Danielle's lack of emotional attachment to mother, as evidenced by Danielle's reluctance to spend time with mother during their visits, as well as the absence of any communication in between those visits. On the other hand, the benefit of terminating mother's relationship and allowing Danielle to be adopted by her caregivers is substantial given Danielle's "healthy attachment" and "strong bond" with them.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
CHAVEZ


_____, J.*
BENKE


---

*       Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.